**Elinor S. NELSON, Ph.D., a Single Person, Plaintiff–Appellant,**

v.

**PIMA COMMUNITY COLLEGE, Pima Community College District, a Public Entity; Johnas Hockaday, Dixie Lee Hockaday, Husband & Wife and Brenda Marshall Beckman, a Single Person, Defendants–Appellees.**

No. 94–15187.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 1995.

Decided May 7, 1996.

Carol Korhonen, Tucson, Arizona, for plaintiff-appellant.

Darwin J. Nelson (argued) and Michael E. Medina, Jr. (on the briefs), Kimble, Gothreau & Nelson, Tucson, Arizona, for defendant-appellee.

Before: GOODWIN, FARRIS and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

A college Affirmative Action Officer sued on numerous state and federal grounds, when the college did not renew her contract after it expired. We affirm the summary judgment against her.

## FACTS

The acting President of Pima Community College, Brenda Beckman, hired Elinor Nelson as Assistant to the President for Affirmative Action and Equal Employment Opportunity. The job description said that the position "reports to the President," provides "staff assistance to the college President," and "receives administrative direction from the College President." Two employment contracts were executed shortly after Nelson was hired. One ran to the end of June 1990, the second from July 1, 1990 to June 30, 1991. Both contracts said that the employment was "to terminate" at the end of the contract. Both contracts provided that "assignment or reassignment of duties ... shall be and shall remain the prerogative of the Chief Administrative Officer...."

Dr. Nelson's employment became problematic immediately. A new Chancellor and President, Jeff Hockaday, was in the process of being selected for the college. Dr. Nelson wrote to him in April, before his selection was final and before he commenced his duties, making three recommendations. First, she wanted her title changed to "Director of Affirmative Action/Equal Employment Opportunity," with a salary commensurate with the Director of Institutional Research and Planning. Second, she said "it is imperative that I be a member of the Chancellor's cabinet." Third, she wanted the title changed for a staff position under her. To support her demands, Dr. Nelson described the "tremendous responsibilities" she would have with respect to the entire functioning of the college.

Dr. Hockaday wrote back that he had a great deal of experience in the business of affirmative action himself, and it was a major concern of his. "You need to expend your energy assisting me in carrying out the function." Dr. Hockaday said that he had looked at the job description for Dr. Nelson's position, found that it did not resemble what she described, and wrote "your job description will not be as universal as you have described it to be. What you describe approximates the responsibilities of the Chancellor." He wrote her that she was "employed as an Assistant to the President and will remain so in the organization I plan. Your position will not be included in the Chancellor's cabinet."

In addition to offending the incoming President, Dr. Nelson quickly developed a hostile relationship with the acting President who had hired her. On May 11, President Beckman sent Dr. Nelson a written reprimand, stating that her "demeanor has been so much at variance with the expectations of a senior administrator of this college as to be absolutely unacceptable." The problems to which Ms. Beckman referred involved "a series of recent interactions" with other employees which caused "serious harm to the working atmosphere of the college."

Dr. Hockaday sent Dr. Nelson a written reprimand shortly after he began his duties. In the reprimand, he was very explicit in giving "instructions" and "clarifications" making it crystal clear that Dr. Nelson was to work for him as staff, and did not have any independent authority to act on her own. He wrote that failure to adhere to the "directives" in the letter would be considered "insubordination." He reiterated what he had told her in April, "the primary responsibility for EEO/AA is mine."

After she left the college's employ, Dr. Nelson filed a complaint with the Office of Civil Rights, United States Department of Education, alleging sex discrimination and retaliatory discharge. OCR investigated, and ruled that there were no violations. An investigative report, findings, and conclusions by the Office of Civil Rights, Department of Education was among the evidentiary submissions considered by the district court.

The Office for Civil Rights had concluded that the reason why Nelson was constructively discharged was not her sex or retaliation for protected activity. OCR found that Nelson's approach to her duties "created too much conflict and was contrary to the approach desired by her supervisor."

As an example of Dr. Nelson's claims that her office had been deprived of needed resources in retaliation for expression of her opinion, OCR discussed the "telephone dispute." Dr. Nelson claimed that she had not been provided with adequate telephone resources. "She requested a six-line telephone and a direct line to the President. In response the President indicated that he only had a two-line phone and that no one in the college had a direct line to him except his secretaries. Thus, although she was denied the request, there was no evidence that she was being treated differently than other employees at PCC."

Dr. Nelson had claimed that the administration did not support her in two instances where she believed there were affirmative action violations. OCR found that she had demanded various documents from the college police chief. When he refused, she ordered all hiring be stopped. She wrote the police chief what purported to be an "immediate temporary remedial affirmative action order," and sent another order to the college's Assistant Vice President of Human Resources, telling them that they could not hire anyone without her approval, until what she perceived as imbalances in job categories were remedied. OCR determined that President Hockaday had not given Dr. Nelson any authority to issue such orders, and concluded he would not have provided her with the authority if she had requested it.

OCR found that Dr. Nelson had also gone beyond her authority with respect to hiring a faculty biologist position. She felt that the hiring process did not conform to proper affirmative action practices, so she ordered the relevant dean not to use the process, to stop the selection process, and not to hire the person who had been selected. The evaluation process included "a teaching module which may favor more experienced teachers," but OCR found no evidence that the evaluation method was invalid or had an adverse impact on a protected group. OCR found that Dr. Nelson had again gone beyond her authority without justification.

OCR also found that employees were often intimidated by Dr. Nelson, because of her "demands for materials which they could not or were not authorized to provide unless [Nelson] went through the proper channels." She also gave orders for which she had no authority to managers of various departments. OCR assumed without deciding that there was a constructive termination, and decided that the reasons for it "were not connected to protected activities per se, but rather were connected to [Nelson's] *professional behavior* which OCR found was outside the framework of protected conduct. OCR found that [Nelson] acted in a manner which was inconsistent with the requirements that Dr. Hockaday had prescribed."

On July 26, Dr. Hockaday wrote another reprimand to Dr. Nelson, telling her again that there was a "problem of procedure" between them, because she was supposed to be "staff" to him and his office, not hers, was to be "the power office." On July 30, Dr. Hockaday met with Dr. Nelson, and told her that her employment at the college could not continue. She was put on paid administrative leave and told to stay away from the building. Dr. Hockaday had the locks on her office changed, "because it had been reported to me that Dr. Nelson was removing Pima Community College property from her office." Dr. Nelson did not return to work, but she was paid nevertheless. She received all of the compensation and benefits to which she was entitled under her employment contract, until it automatically terminated nearly a year later, on June 30, 1991.

## ANALYSIS

We review the grant of summary judgment *de novo, Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir. 1994), denial of leave to amend for abuse of discretion, *Fuller v. Vines,* 36 F.3d 65, 67 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995), and the attorney's fees award for abuse of discretion, *In re Washington Public Power Sys. Lit.,* 19 F.3d 1291, 1296–97 (9th Cir.1994).

## I. FIRST AMENDMENT CLAIMS

Dr. Nelson argues that she established a genuine issue of fact about whether she was constructively discharged because she criticized the college's affirmative action program. For purposes of this discussion, we assume without deciding that her criticism of the college's affirmative action plan was protected speech, and that locking her out of her office a year before her contract ended was constructive discharge, even though she was paid to the end of her contract.

Nelson appears to be arguing on appeal that the district court gave preclusive effect to the OCR report, but it did not. Both sides agree that the district court may properly use the OCR report and findings as evidence on summary judgment. That is what the district court did. *Cf. Bradshaw v. Zoological Soc'y of San Diego,* 569 F.2d 1066, 1069 (9th Cir.1978) (EEOC report "was admissible evidence").

We have reviewed all the evidentiary submissions on both sides *de novo,* and reach the same conclusion as did the district court and the Office of Civil Rights. Dr. Nelson submitted no evidence from which a jury could conclude that the college's decision to dispense with her services resulted from her criticism of its affirmative action plan. The evidence she had was that she had criticized the college's plan, and she was told not to come back to work some time later. But a lot happened in addition to those two facts.

Dr. Nelson refused to perform her duties in accord with her instructions, did things she was prohibited from doing, and threw the whole college into turmoil. Dr. Hockaday wrote her in one of her reprimands, four days before he fired her, "at least 25% of my time at Pima has been spent in trying to sort through problems that you have created." Since she had stuck her thumb in Dr. Hockaday's eye before he even started work, and had made impertinent demands such as the six line phone, she had no reservoir of good will on which to draw.

Terminations that allegedly violate the First and Fourteenth Amendments are subject to a three-part test to determine whether constitutional rights have been violated.... First, the terminated employee must establish that the conduct at issue was entitled to constitutional protection. Second, the employee must prove that the constitutionally protected conduct was a substantial or motivating factor behind the termination. Third, once the terminated employee has established the first two elements, the employer must prove that it would have made the same decision to terminate even if the employee had not engaged in the protected conduct.

*Erickson v. Pierce County,* 960 F.2d 801, 804 (9th Cir.1992).

Dr. Nelson submitted no evidence whatsoever to satisfy the second requirement of the *Erickson* test, that her criticism of the college's affirmative action program "was a substantial or motivating factor behind the termination." Even if the inference were drawn, *post hoc ergo propter hoc,* a finder of fact would have to conclude on the evidence submitted that the college "would have made the same decision to terminate even if the employee had not engaged in the protected conduct." The evidence submitted on the cross motions for summary judgment did not permit a reasonable inference that Dr. Nelson was fired because she had criticized the affirmative action program, so the district court was obligated to protect the defendants from wasting further resources on a trial. *See* Fed.R.Civ.P. 56(c).

The only speech which the evidence showed contributed to Dr. Nelson's discharge was her orders. She ordered hiring stopped, at the police department, and in the biology department. She issued these orders in the face of direct and express commands from

the president of the college that she provide staff advice to him, and not exercise power in her own name. She appears to be claiming that such orders are protected speech. We reject that argument.

 Issuance of unauthorized orders by an employee, on behalf of the institution, is not protected speech. The law on government employee speech generally deals with employees purporting to express what they think as individuals. In that context, a court determines whether the speech addresses matters of "public concern," *Connick v. Myers,* 461 U.S. 138, 144–45, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and if it does, the court balances the employee's "interest in making her statement against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin v. McPherson,* 483 U.S. 378, 387–88, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). We assume *arguendo,* that Dr. Nelson's orders addressed matters of public concern. *See Wheaton v. Webb–Petett,* 931 F.2d 613, 618 (9th Cir.1991). But an employee's interest in giving unauthorized and insubordinate orders could rarely if ever outweigh her employer's interest in promoting the efficiency of public services performed through employees.

 All five factors of the balancing test used for government employee speech justify government control of orders issued in the government's name. The established factors are whether the speech (1) impairs discipline or control by superiors, (2) disrupts coworker relations, (3) erodes close working relationships premised on personal loyalty and confidentiality, (4) interferes with the speaker's performance of his or her duties, or (5) obstructs the routine operation of the office. *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (1993). An order issued by a subordinate in the face of a command that she act as staff and exercise no authority on her own is impermissible under all five factors.

As the above analysis shows, under the established tests for constitutional protection of employee speech, the constitution does not protect insubordinate and unauthorized employee's speech, where the speech purports to exercise governmental authority over others. It is not necessary to establish that disruption in the workplace occurred, because the insubordinate and unauthorized exercise of purported government authority by the speaker is itself disruption in the workplace. *Cf. Connick,* 461 U.S. at 141–42, 154–56, 103 S.Ct. at 1687, 1692–94. The government employer is entitled to control the exercise of governmental authority by its employees. Dr. Nelson's orders were not merely the expression of her personal opinion. Her words were the purported exercise of her authority as an official of the college.

## II. STATE WHISTLEBLOWER CLAIMS

 Dr. Nelson claims that her discharge violated an Arizona statute protecting employees and amounted to a state tort, because she was a "whistleblower." Arizona prohibits "reprisal against an employee for a disclosure of information of a matter of public concern by the employee to a public body which the employee reasonably believes evidences: 1. A violation of any law. 2. Mismanagement, a gross waste of monies or an abuse of authority." A.R.S. § 38–532(A). Dr. Nelson's theory appears to be, on this as on the First Amendment theory, that she was constructively discharged because of her criticism of the college's affirmative action program. As explained above, there is no evidence in the record from which a trier of fact could have concluded that Dr. Nelson was discharged because she criticized the college's affirmative action program. Her claim that she did one thing, and subsequently the other thing happened to her, is, in the factual context of this case, insufficient to allow that inference. The mere existence of a "scintilla" of evidence is not enough to create a "genuine issue of material fact" in order to preclude summary judgment. *United States ex rel. Anderson v. Northern Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 245–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)), *cert. denied,* —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996). Likewise, mere allegation and speculation do not create a factual dispute for purposes of

summary judgment. *Witherow v. Paff,* 52 F.3d 264, 266 (9th Cir.1995).

### III. 42 U.S.C § 2000e–3(a)

■ The Civil Rights Act of 1964 prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this title." 42 U.S.C. § 2000e–3(a). This law protects an employee from discrimination "because" the employee has opposed what she reasonably believes to be an unlawful practice. *See Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir.1978). We assume for purposes of discussion, but do not decide, that opposition to the college's affirmative action plan would be protected conduct. *But see Holden v. Owens–Illinois, Inc.,* 793 F.2d 745, 749 (6th Cir.1986) (opposition to affirmative actions programs not protected under § 2000e–3(a), because Title VII does not mandate implementation of affirmative action programs), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704 (1986). But as we explain above, Dr. Nelson had no evidence that the college's actions against her were "because" of her criticism.

■ We assume for purposes of discussion, without deciding, that Dr. Nelson's unauthorized orders could be treated as "opposition" under § 2000e–3(a). Nevertheless, "an employee does not receive special protection under Title VII simply because the employee handles discrimination complaints or works on affirmative action matters.... 42 U.S.C. § 2000e–3(a) does not prevent an employer from dismissing an employee who handles discrimination complaints as part of his job when the employee handles these complaints contrary to the instructions of his employer." *Id.* at 751.

■ As we have held before, a college or university affirmative action officer is "not ... a private attorney general." *Smith v. Singer Co.,* 650 F.2d 214, 217 (9th Cir.1981). We held in *Smith* that where a discharged employee claimed that his supervisors had not yielded to his efforts to accomplish needed reforms in his company's affirmative action program, the employee's affirmative action responsibilities did not entitle him to

repudiate his staff duties and engage in insubordination.

> The executive orders and regulations ... encourag[e] employers to devise their own affirmative action programs rather than have such programs thrust upon them. It was the very purpose of appellant's job to assist Singer in achieving such compliance; the job was held by him not as a private attorney general but as a company executive. The position was unique in that it required the occupant to act *on behalf of* his employer in an area where normally action against the employer and on behalf of the employees is protected activity.

*Smith,* 650 F.2d at 217. As an executive employee of the college, the affirmative action officer's duty to her supervisor included obedience to reasonable orders. Warren A. Seavey, *Handbook of the Law of Agency,* § 145(b) (1964); *see also* Restatement (Second) of Agency § 385(1) ("an agent is subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he has contracted to perform"). A college president is entitled to use an affirmative action officer as staff, without having her usurp his duties and disobey his orders.

### IV. OTHER STATE LAW CLAIMS

■ Dr. Nelson claims that there was a genuine issue of fact as to whether defendants were liable to her for the tort of intentional infliction of emotional distress, under *Ford v. Revlon,* 153 Ariz. 38, 734 P.2d 580, 585 (1987). There was not, because defendants' conduct was not, as a matter of law, "extreme and outrageous." *See Lucchesi v. Frederic N. Stimmell, M.D.,* 149 Ariz. 76, 716 P.2d 1013, 1015–16 (1986).

■ Dr. Nelson also claims a genuine issue of fact on the theory that when President Beckman hired her, she told her that the college affirmative action plan conformed to federal guidelines, but it did not. Even if we were to assume that expression of such an opinion could amount to a false representation for purposes of a negligent misrepresentation claim, Dr. Nelson had no evidence of damages on account of the college's affir-

mative action plan not being as good as she had been told.

 Dr. Nelson also claimed breach of contract, because when she was hired she had an expectation of long-term employment. The only evidence she supplies is her statement in her affidavit that one-year contracts in higher education are commonly renewed from year to year. Her written contract unambiguously provided for termination, and gave her no right of renewal. She was paid all salary and benefits due to the very last day of it. Dr. Nelson's "hopes and expectations" could not change the express provision that her contract was for one year. *Van Buren v. Pima Community College Dist. Bd.,* 113 Ariz. 85, 546 P.2d 821, 823 (1976); *Rogers v. American President Lines, Ltd.,* 291 F.2d 740, 742 (9th Cir.1961). Her numerous other state law claims are likewise unsupported.

## V. AMENDMENT

After one of the two summary judgments was granted, Dr. Nelson moved to amend her complaint. She sought to add claims that putting her on administrative leave while her contract ran out defamed her, that defendant's termination of her interfered with advantageous contractual relations which she expected to form with future employers and that her termination was retaliation in violation of the Civil Rights Act of 1991. These amendments would have been futile, so the district court did not abuse its discretion by denying leave to amend. *See Barber v. State of Hawaii,* 42 F.3d 1185, 1197–98 (9th Cir.1994).

## VI. ATTORNEY'S FEES

The district court awarded $15,000 as attorney's fees against Dr. Nelson, pursuant to an Arizona law providing for attorneys' fees awards in contract cases. A.R.S. § 12–341.01(A). Defense counsel put in proof that his total fees were almost $92,000, billed to the college's insurer at $85 a hour and $100 an hour for attorney's work, and $35, $40, and $50 per hour for law clerk's and legal assistance's work. The district court granted those attorney's fees which the judge found arose out of the contract aspects of the

dispute. The district judge did not abuse his discretion in the award of fees. *See In re Washington Public Power Sys. Lit.,* 19 F.3d 1291, 1296–97 (9th Cir.1994).

## VII. COSTS AND FEES ON APPEAL

The parties have made various motions for costs and fees on appeal. Appellant's request for attorney's fees on appeal is DENIED. Appellant's request for costs on appeal is DENIED. Pursuant to Federal Rule of Appellate Procedure 39(a), costs on appeal are hereby awarded to Appellees.

Appellees have also requested attorney's fees on the ground that the appeal is frivolous. Pursuant to Federal Rule of Appellate Procedure 38, we shall award attorneys' fees on the basis of frivolousness unless, within 30 days of the date this decision is filed, appellant shows cause to the contrary.