**Suzanne GARNER, Plaintiff,**

v.

**MOTOROLA, INC., an Arizona Corporation, Defendant.**

**No. CIVA97174PHXPGR(WGY).**

United States District Court, D. Arizona.

April 27, 2000.

*MEMORANDUM*

## I. INTRODUCTION

This is an action brought by Suzanne Garner ("Garner"), a former employee of Motorola, under the Equal Pay Act (29 U.S.C. § 206[d][1] [1999]), Title VII (42 U.S.C. § 2000e *et seq.* [1999], as amended), and the Arizona Civil Rights Act (Ariz. Rev.Stat. § 41–1461 *et seq.* [1999]). Garner claims that, due to gender discrimination, she was paid less than male co-workers who were doing substantially equal work. She has also brought a claim under Title VII and the Arizona Civil Rights Act for retaliation taken against her after she discussed the salary discrepancy with Motorola's management. Motorola presents motions for summary judgment on both of Garner's claims.

## II. FACTUAL BACKGROUND

Save as indicated, the following facts appear without dispute upon the summary judgment record. Motorola hired Garner as a "level E11" software engineer on September 13, 1993, at a annual salary of $60,000 plus a one-time $2,000 bonus. In her own words, Garner's job responsibilities "fell mainly into the process area, software process improvement area." Garner Dep. at 281. Garner's main area of focus was known as "metrics," which are "data measurements ... used to understand the status of the [software] program and report[ ] the status of the program." *Id.* at 283.

Kraig J Marton, Marton & Hall PA, Phoenix, AZ, Kimberly Ann Eckert, Law Offices of Kimberly A Eckert, Tempe, AZ, for Suzanne Garner, plaintiff.

Monica Linn Goebel, Mark G Kisicki, Steptoe & Johnson LLP, Phoenix, AZ, Bobbi A Kiese, Kiese & Lehmer Ltd, Phoenix, AZ, Gayla L Moss, Motorola Law Department, Chandler, AZ, for Motorola Inc, an Arizona corporation, defendant.

*ORDER*

YOUNG, District Judge.[1]

Due to the need to refine certain case citations, the opinion of February 11, 2000 (Docket No. 110) is withdrawn and the Memorandum and Opinion of April 27, 2000, is substituted in place thereof.

In August, 1994, due in part to her satisfactory performance, Garner received a 6.5% merit raise, bringing her annual salary to $63,900. *See* Jones Aff. at ¶ 2. In the summer of 1994, Garner was given a team leader role with the Technology & Tools Team, an increase in responsibility. *See* Garner Dep. at 157–59. In October 1994, Garner complained to her manager, Ann Miller, that she believed she was un-

---

1. Of the District of Massachusetts, sitting by designation.

derpaid. *See id.* at 99–100. Garner admits, however, that she did not raise the issue of gender discrimination at that time. *See id.* at 100. During the next month, she also spoke to Ray Leopold, another manager at Motorola. *See id.* at 86–100. A compensation review was completed and Motorola notified Garner that she was being paid within the appropriate range for a level "E11" software engineer. *See id.* at 102–103.

Garner has identified nine males hired into her own department around the time Garner was hired who were paid between $66,000 and $86,000 annually, compared to her original $60,000 salary. *See* Pl.'s Resp. on Pay Related Claims ("Pay Resp.") at 2. Motorola admits that Garner "was the lowest paid E11 software engineer in her department." Def.'s Mot. on Pay–Related Claims ("Pay Mot.") at 3. Garner claims that these male coworkers have jobs that are substantially equal to hers and that there are no legitimate business reasons for the discrepancy in salary. In contrast, Motorola has provided extensive documentation in order to show that Garner held a unique job that was significantly different from those held by the males. For example, four of the males were described as "Verification and Validation" ("V & V") engineers who had tasks so different from Garner's that Garner admits that she does not understand the differences. *See* Garner Dep. at 163. And unlike four males, she did not have any responsibility for System Control Segment, which Garner admits "really wasn't a process function." *Id.* at 160. With a brief unsuccessful exception, she also lacked management responsibilities. *See id.* at 152–55. Furthermore, Garner held an E11 position while four of the males held an E12 position, requiring greater leadership.

Motorola also claims that the male workers were paid more for legitimate business reasons such as education, experience in the relevant aerospace sub-industry, enticement to leave a prior high-paying job, and enticement to relocate to Arizona. *See* Jones Aff. ¶¶ 6–8. These factors are apparently applied on a subjective basis by the compensation officer. *See id.* ¶¶ 8–9. Motorola does, however, maintain a salary "range" for job assignments, in which range it insists it located Garner's pay. *See id.* ¶ 3.

From November 1994 on, exactly what occurred is in dispute. Motorola claims that Garner's performance at work began to deteriorate. Garner, in contrast, claims that Motorola began to construct a negative employment record and took disciplinary action against her in retaliation for her complaints about being underpaid.

Supported by the affidavits of supervisors, and excerpts from Garner's own deposition, Motorola alleges the following facts. Beginning in November 1994, and continuing for the next two-and-a-half months, Garner exhibited emotional and noncooperative behavior at work. *See* Garner Dep. at 250–52, 267–69. Her performance around that time was, by her own admission, that of a "zombie" and she estimated she was performing her job functions only 12.5% of the time. *See id.* at 268, 271–73. In November 1994, she was removed from the Technology & Tools Team leadership position for failure to execute the staffing plan for the team. *See id.* at 255–56. In mid-February 1995, Garner was placed on what Motorola calls a Performance Improvement Plan ("PIP"). *See id.* at 377–82. She was told she would not receive a raise during 1995 because of the PIP. In fact, however, her salary was raised in February 1996, bringing it up to $65,800. *See* Garner Dep. at 110–12. Supervisors reported that Garner's performance was declining in 1996 and 1997 and that on various tasks she turned in unacceptable work or essentially did no work. *See id.* at 438–39. On April 17, 1997, Garner received a final warning about her lack of productivity. *See id.* at 449. She responded with a list of reasons why she felt she could not be successful. *See id.* at 444–45. One of those reasons was "com-

puter resources." While Motorola's information systems personnel were examining Garner's computer, they discovered a large amount of non-work-related software which Garner admitted to installing on her machine. *See* Schwab Dep. at 161–64; Garner Dep. at 347–48, 352–53. As a result of this discovery, and ongoing performance problems, Garner was terminated effective April 23, 1997. *See* Schwab Dep. at 165–67.

In contrast, Garner asserts the following facts. Garner's performance during her first year at Motorola was generally excellent. She received a number of awards for significant contributions, she was appointed to form and manage the Technology & Tools Team, she received the largest raise of anyone on her team, she had been identified as a "High Potential" employee and had received very positive feedback from her supervisor and coworkers. *See* Pl.'s Resp. on Retaliation Claim ("Retaliation Resp.") at 2. Despite her own statements to the contrary at her deposition, Garner's Retaliation Response suggests that her complaints about salary in October 1994 related to gender inequality. *See id.* at 3. After her complaint about salary, retaliation began and her performance was made to look poor. She was removed from the Technology & Tools Team within three weeks for the pretextual reason that she failed to staff a position within one month although the average time for staffing in her group was three months. *See id.* A very negative Performance Appraisal and Development Plan ("Performance Appraisal") was issued by her supervisor soon thereafter. *See id.* Garner claims that the Performance Appraisal was retaliatory, pretextual, and criticized her over petty issues or for lax work reporting practices which had long been accepted from her and from others without criticism. *See id.* at 4–5. Negative performance evaluations continued until eventually she was terminated on April 23, 1997. The conclusion to be drawn from Garner's version of the facts is that her employment record became tarnished not because of any actual performance problems, but rather in response to her having complained about her salary. To the extent that actual performance problems later developed, they might arguably be attributed to Garner's progressive frustration with having to fight against unfair negative evaluations.

Garner filed a complaint with the Equal Opportunity Employment Commission (the "Commission") on September 11, 1995. *See* Garner Dep. at 127–28. She subsequently brought this suit against Motorola on the basis of the Equal Pay Act, Title VII, and the Arizona Civil Rights Act. Garner also claims that Motorola retaliated against her allegations of discrimination, in violation of Title VII and the Arizona Civil Rights Act. Motorola brings motions for summary judgment on both claims.

## III. RELEVANT LEGAL STANDARDS

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material" fact is one that "might affect the outcome of the suit" under the applicable legal standard. *Id.* at 248, 106 S.Ct. 2505.

## IV. ANALYSIS

### A. Garner's Pay–Related Claim

### 1. Statutory Distinctions

Garner has brought her wage discrimination claim under the Equal Pay Act (29

U.S.C. § 206[d][1] ), Title VII (42 U.S.C. § 2000e *et seq.*), and the Arizona Civil Rights Act (Ariz.Rev.Stat. § 41–1461 *et seq.*) Before an analysis of the summary judgment motion can be undertaken, a review of the relationship among these three statues is in order.

■ The Equal Pay Act imposes the burden of proving a prima facie case on a plaintiff alleging gender discrimination. *Stanley v. University of S. Cal.*, 178 F.3d 1069, 1073–74 (9th Cir.1999). To meet the burden, the plaintiff must show that the jobs being compared are "substantially equal," *id.* at 1074, and that she did not receive equal pay for that substantially equal work. *See Spaulding v. University of Wash.*, 740 F.2d 686, 696 (9th Cir.), *overruled on other grounds by Atonio v. Wards Cove Packing Co., Inc.*, 810 F.2d 1477, 1482 (9th Cir.1987) (holding disparate impact analysis may be applied to Title VII employment discrimination cases). Once the plaintiff's burden is met, the burden shifts to the defendant who must prove that the disparity in pay is caused by some factor other than gender. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

■ The Equal Pay Act establishes four affirmative defenses upon which the defendant can rely in order to escape liability. *See id.* These defenses permit instances of disparate pay caused "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The intentions of the employer are not a factor in determining liability under the Equal Pay Act. *See Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir.1986).

■ Under Title VII, however, once a plaintiff produces evidence supporting a prima facie case of gender discrimination, only the burden of production falls on the defendant who must produce some evi-dence that a nondiscriminatory reason exists for the wage differential. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If that evidence is produced, the plaintiff must prove *intentional* discrimination despite the reasons the defendant has advanced. *See id.* at 256, 101 S.Ct. 1089. By legislation popularly known as the "Bennett Amendment," Congress has expressly incorporated into Title VII the four affirmative Equal Pay Act defenses. *See* 42 U.S.C. § 2000e–2(h) (1999); *see also* Bennett Amendment, Pub.L. No. 88–352, § 703, 78 Stat. 255 (July 2, 1964). The Supreme Court in *County of Wash. v. Gunther*, 452 U.S. 161, 170–71, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), ruled that the Bennett Amendment did not, however, restrict Title VII's prohibition of sex-based wage discrimination to claims based on "equal work." Thus claims for wage discrimination can be brought under Title VII even when there is no male coworker performing an "equal job." *Id.* at 178–180, 101 S.Ct. 2242. Furthermore, the Ninth Circuit has ruled that when invoking the four Equal Pay Act-based affirmative defenses in a Title VII case, the defendant employer bears the burden not only of coming up with some evidence supporting one of the four affirmative defenses but must also shoulder the burden of persuading the jury that the wage differential resulted from a factor other than gender. *See Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 875 (9th Cir.1982). Thus, a Title VII analysis of a wage discrimination claim is conducted with reference to the Equal Pay Act allocation of the burdens of proof. *See id.* at 875–877; *Gunther v. County of Wash.*, 623 F.2d 1303, 1313 (9th Cir.1979) ("Equal Pay Act Standards apply in Title VII suits when plaintiffs raise a claim of equal pay."), *aff'd*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ A claim for wage discrimination under the Arizona Civil Rights Act is subject to the same legal analysis as a claim under

Title VII, and incorporates the affirmative defenses of the Equal Pay Act. *See Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 165–66 & n. 3, 673 P.2d 907 (1983) (en banc); *Arizona Civil Rights Div. v. Olson*, 132 Ariz. 20, 25, 643 P.2d 723 (1982).

The present motion for summary judgment will thus be analyzed with respect to a claim under the Equal Pay Act because that analysis is applicable to all three statutes.

■ It should be noted at the outset that the standards for summary judgment in an employment discrimination case are rigorous. "[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996) (quotations omitted) (Age Discrimination in Employment Act case); *see also Lam v. University of Hawaii*, 40 F.3d 1551, 1563 (9th Cir.1994). This is especially true in the context of Title VII actions, where motive is a factor. *See Lowe v. City of Monrovia*, 775 F.2d 998, 1008–09 (9th Cir.1985).

2. Substantial Equality of Job

■ To establish a prima facie case for an equal pay violation, Garner must produce evidence that she performed "substantially equal" work for unequal compensation. *See Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1414 (9th Cir.1988) (citing *Spaulding*, 740 F.2d at 696). Jobs are considered "equal" if "their performance requires 'equal skill, effort, and responsibility' and they are performed under 'similar working conditions.'" *Id.* (citing 29 U.S.C. § 206[d][1] ). A plaintiff need only show that "the jobs [being com-

pared] are substantially equal, not necessarily that they are identical." *Spaulding*, 740 F.2d at 697. "In assessing a plaintiff's claim of substantial equality between jobs, a court should rely on actual job performance and content rather than job descriptions, titles, or classifications." *Forsberg*, 840 F.2d at 1414. The elements of "skill," "effort," "responsibility," and "similar working conditions" are considered separate tests, each of which must be met by the plaintiff. *See id.*

■ Motorola's first basis for its summary judgment motion is that Garner cannot establish a prima facie case that she performed substantially equal work. Garner has, however, raised a genuine issue of material fact as to whether her job was substantially equal to those of males who were paid more. Motorola has set out in some detail, supported by exhibits and affidavits, illustrations of how the male coworkers performed different jobs by working on different software functions or by having management responsibilities which Garner's job lacked. *See* Pay Mot. at 8–9.

Garner, in turn, has provided evidence that her job was substantially equal to that of the males. Brian Lawrence, a purported expert on software engineering, examined the situation and reported that Garner's job was substantially equal to at least four of the males' and exceeded the responsibilities of six other "E11" male coworkers. *See* Pay Resp. at 3.[2]

Garner has also shown some evidence from Motorola's own documentation suggesting substantial equivalence. For example, Motorola's Performance Appraisal Development Plan form has a summary, in order of importance, of the "major responsibilities" of the jobs and virtually all members of Garner's team had the same set of responsibilities listed as did she. *See* Def.'s Statement of Undisputed Material

---

**2.** Motorola insists that Lawrence does not qualify as an expert in human resources, that his conclusory report is flawed because, as he described in his deposition, the report was prepared in eight hours based only on what

Garner told him, that it fails to explain its reasoning and methods, and that it was drafted by Garner's counsel. *See* Reply in Support of Pay Motion at 9–10. *See id.*

Facts on Pay Mot.Exs. E, S, V, W, X.[3] Garner herself has incorporated her statement of facts in her affidavit and thus also alleges personal knowledge of the jobs involved and that they are substantially equal.

Software engineering may be a difficult job to categorize. Because of the complexity and creative role of the underlying work, it does not lend itself to easy comparative analysis as would a more delineated job such as that of airline pilots who fly different routes. Although Garner primarily was assigned to metrics, that may reflect more of a choice as to what tasks within the team were assigned to her rather than a fundamental difference in the job she was performing for Motorola. She was, after all, considered an "E11" software engineer. Although labels are not determinative of substantial equality, *see Spaulding*, 740 F.2d at 697, this use of the same label does indicate that Garner's job was viewed by *Motorola* as being in the same category of work as the higher-paid males. Motorola has admitted that Garner was the lowest-paid E11 engineer. Although Motorola's challenge to the credibility of Garner's expert is rather compelling, Garner has presented enough proof to show a genuine issue of fact as to whether her job was substantially equal to that of her male coworkers. The facts are best left to the jury to unravel.

Since Garner has established some evidence of substantial equality, the next question is whether she has failed to overcome Motorola's affirmative defenses that the differential was based on a factor other than sex.

### 3. A Factor Other Than Sex

██ The Equal Pay Act provides for an affirmative defense to any defendant who pays differential salaries "based on any other factor other than sex." 29 U.S.C. § 206(d)(1). This broad exception covers legitimate business reasons for discriminating as to pay. By way of example, an employer can pay different salaries on the basis of "professional experience and education," *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir.1994), may use prior salary to set current salary, *see Kouba*, 691 F.2d at 878, and is permitted to use gender-neutral job evaluation systems, *see Equal Employment Opportunity Comm'n v. Maricopa County Community College Dist.*, 736 F.2d 510, 514 (9th Cir.1984). In the Ninth Circuit, showing a factor other than sex is an affirmative defense as to which the defendant bears the burden of proof. *See Kouba*, 691 F.2d at 875.

Motorola has advanced evidence that it uses factors other than gender to determine an employee's salary. Included in its "package" of considerations are years of experience and type of experience, identity of past employers, level and focus of education and degrees, market conditions, past salary, and salary required to entice relocation. *See* Jones Aff. ¶¶ 5–8. Using this criteria, Motorola argues that all of Garner's male coworkers have various characteristics, other than gender, that legitimately entitle them to additional pay. The circumstances vary by individual, but in general it seems that some males have advanced degrees such as a Ph.D. in Physics or Computer Science, some males have experience working with NASA or in other space-related work, some have trained at the Software Engineering Institute (an educational institution for engineers), and many of them have relocated or left other high-paying jobs to come to Motorola. In contrast, Garner has a B.S. in Math, no Institute training, was already living in Arizona when she applied for the job and was unemployed prior to joining Motorola

---

**3.** The "responsibilities" listed, however, seem to apply more to Software Process and Technology Team as group goals, and may not completely define the nature of Garner's job in particular. These forms also contain an "expected results" section which lists visibly different expectations for each worker. The forms are therefore not conclusive, but they support an inference that Garner was working on a job similar to the male coworkers.

(her previous job paid $60,000 per annum). *See* Pay Mot. at 13–14. Motorola also claims that higher qualified females are some of the highest-paid E11 engineers at Motorola. *See* Jones Aff. ¶ 32(k) –(1); Ex. II.

Motorola has thus provided credible evidence that there were factors other than gender which influenced the pay differential. If borne out at trial, this evidence may satisfy Motorola's burden under the affirmative defenses of the Equal Pay Act. Garner has rebutted, however, with evidence of her own showing that gender may still be the basis for the discrepancy. Garner has presented Kathy Gromoll, a purported expert on compensation. *See* Garner Facts Ex. 7. Gromoll's report indicates that Motorola's pay factors were not consistently applied, that E11 males consistently received larger raises once hired, that prior earning power was not applied equitably to females, and that Motorola did not seem to have a bona fide merit system. *See id.* Expert testimony may be sufficient to establish a question of fact relating to gender discrimination. *See Butler v. Home Depot, Inc.,* Nos. C–94–4335 SI, C–95–2182 SI, 1997 WL 605754, at *6 (N.D.Cal. Aug.29, 1997). Garner also claims that she has eighteen years of software experience, rivaling some higher-paid males, and that a Motorola representative has stated that education is not a relevant salary factor after ten years of experience. Naturally, Motorola has also alleged that Gromoll's opinion are supported only by speculation and superficial analysis of incomplete information. *See* Reply in Support of Pay Mot. at 5–8. Even in the absence of the expert, however, the record here has sufficient room for uncertainty and interpretation such that it cannot be said on a motion for summary judgment that Motorola has conclusively carried its burden of explaining the wage disparity.

Garner has revealed a material dispute of fact underlying Motorola's affirmative defense. It would be inappropriate at this stage to keep that factual determination from the jury.

**B. Garner's Retaliation Claim**

Garner has also brought a claim that Motorola retaliated against her in violation of Title VII (42 U.S.C. § 2000e *et seq.*) and the Arizona Civil Rights Act (Ariz.Rev. Stat. § 41–1461 *et seq.*).[4] *See* Am.Compl. ¶ 27.

Title VII prohibits an employer from taking adverse employment action "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter" or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). "A plaintiff bringing an action under this section is required to establish a prima facie case of retaliation by showing that she engaged in a protected activity, that she was thereafter subject to adverse employment action by her employer, and that there was a causal link between the two." *Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346, 1354 (9th Cir.1984) (citing *Cohen v. Fred Meyer,* 686 F.2d 793, 796 [9th Cir.1982] ). If the employee presents a prima facie case, the burden of going forward falls on the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. *See id.* If the employer does so, the employee is then given an opportunity to show that a discriminatory intent motivated the employer's action, perhaps by showing that the employer's explanation was a pretext or that a discriminatory reason actually motivated the employer. *See id.*

---

4. For purposes of this motion, this Court will analyze Garner's claim under the Arizona Civil Rights Act by Title VII standards. "The Arizona Civil Rights Act is modeled after and generally identical to the federal statute in the area.... Accordingly, we find federal Title VII case law persuasive in the interpretation of our Civil Rights Act." *Higdon,* 138 Ariz. at 166 n. 3, 673 P.2d 907.

Garner filed her gender discrimination complaint with the Commission on September 11, 1995. Despite her suggestion in her pleadings on these motions, Garner has presented absolutely no evidence that indicates that she complained to Motorola or to anyone else about gender discrimination until the time of that September 1995 Commission complaint. Indeed, Garner specifically admitted several times in her deposition that each time she complained to supervisors about her salary being low, the question of gender discrimination never arose:

Q. Did you tell—well, during that conversation [with Ann Miller in October 1994], you didn't raise gender, did you?

A. No.

Q. During your conversation with Ray Leopold, you didn't say that you believed your salary was low due to your gender, right?

A. No.

Garner Dep. at 100.

Q. At that point [January 1995] you did not say to Marti that you thought it was your gender, did you?

A. I don't think I did.

*Id.* at 103.

Q. Now, in the conversations that you had with Marti, with Ann, and with Ray, no one told you that your compensation was at the level it was because of your gender, correct?

A. No.

.    .    .    .    .

Q. During the—well, did you tell Marti or Ann or Ray Leopold, during the conversations you had in late 1994 and early 1995, that you felt your compensation level was based on your gender?

A. No.

*Id.* at 105–06.

Q. But Prior to filing your EEOC charge, you had not said to Motorola that you thought there was a salary inequity based on gender?

A. No. . . . No, I had not.

*Id.* at 129.

These answers at Garner's deposition are conclusive admissions that Garner did not make a gender-based complaint prior to her Commission charge. The deposition evidence unambiguously compels the conclusion that Garner had not engaged in a "protected activity" until September 11, 1995.

Motorola has shown many documented, legitimate, nondiscriminatory reasons for disciplining or terminating Garner prior to that time. Garner thus has the obligation to rebut Motorola's showing by a preponderance of the evidence that her engaging in protected activity under § 2000e–3 was one of the reasons for the adverse employment action, and that but for such an activity she would not have faced such action. *See Kauffman v. Sidereal Corp.,* 695 F.2d 343, 345 (9th Cir.1982). Complaints about salary underpayment which are not based on unlawful unemployment practices proscribed by Title VII are not "protected activities" within the meaning of Title VII's retaliation provisions. *See Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1411 (9th Cir.1987) (plaintiff's complaints about radio show format change were based on personal reasons, not discriminatory reasons); *see also Brower v. Runyon,* 178 F.3d 1002, 1006 (8th Cir. 1999) (undisputed that in conversations, plaintiff did not complain of illegal discrimination, thus plaintiff failed to show required beginning of protected proceeding or investigation under Title VII); *Barber v. CSX Distribution Servs.,* 68 F.3d 694, 701–02 (3d Cir.1995) (complaints about unfair treatment in general, and not illegal discrimination, did not constitute requisite "protected conduct"); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 828 (1st Cir.1991) (sequence of events suggested absence of causal connection between discrimination complaint and termination, where complaint was antedated by acts of insubordination and other legitimate reasons for dismissal); *Ammons v. Zia Co.,* 448 F.2d

117, 120 (10th Cir.1971) (termination was based on complaints stemming from complaints of underpayment, not complaints of underpayment by reason of sex).

The case of *Hashimoto v. Dalton*, 118 F.3d 671 (9th Cir.1997), *cert. denied*, 523 U.S. 1122, 118 S.Ct. 1803, 140 L.Ed.2d 943 (1998), offers Garner no additional support on this point. In *Hashimoto*, the plaintiff employee met with an Equal Employment Opportunity counselor to review a failure of her employer to update her job description. Although she "did not at that time allege discrimination," the Ninth Circuit concluded that she had engaged in "protected activity" as required by Title VII when she participated in the "machinery set up by Title VII." *Id.* at 679–80. "[T]here can be little doubt that Hashimoto's visit with the EEO counselor constituted participation 'in the machinery set up by Title VII.'" *Id.* at 680. Contact with the counselor was thus itself protected activity, even in the absence of an articulated complaint of gender discrimination. *See id.; see also Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 627 (11th Cir.1983), *Gonzalez v. Bolger*, 486 F.Supp. 595, 601 (D.D.C.1980), *aff'd*, 656 F.2d 899 (D.C.Cir. 1981). Here, Garner does not allege that she participated in any part of the "system" designed to protect against discrimination. Rather, by her own evidence, she made a generalized complaint to her supervisors about her salary and did not at that time allege sex discrimination. Such a complaint is not "protected activity."

Garner's retaliation claim therefore must be limited to adverse employment action allegedly taken against her after September 11, 1995, when her general complaints of underpayment transformed into a specific complaint of gender discrimination. That Commission complaint is plainly a "protected activity" under Title VII.

By September 11, 1995, Garner's employment record at Motorola was already filled with serious blemishes. Garner's workplace deficiencies are chronicled by Motorola's Retaliation Motion, supported by Garner's own deposition and written documentation. By way of summary, they include: failure to execute staffing plan as the Technology & Tools team leader (November 1994), emotional and uncooperative behavior at work (winter of 1994–1995) including crying at her desk and during meetings, failing to initiate ideas in meetings, performing her job for only 12.5% of the time she was at work (by her own admission), poor timeliness of output, time delays, and failure to produce weekly status reports for two months.

Garner's allegations that Motorola retaliated by fabricating all of these deficiencies prior to her gender-based complaint is difficult to believe upon a review of the summary judgment record. This, of course, is immaterial and beside the point. What *is* important is that all these allegations are legally unhelpful to her because these negative evaluations of her work were made *prior* to Motorola's becoming aware that Garner was complaining of gender discrimination.

■ Adverse employment action after her Commission complaint is, however, subject to Title VII scrutiny if that action is conducted in retaliation for her protected activity. After September 1995, Garner's performance allegedly continued to decline. Motorola's Retaliation Motion details these events, which include missing a week of work due to a Driving Under the Influence charge, admittedly failing to arrive at work at the required time (despite warnings), disruptive and unproductive mannerisms, failure to meet deadlines, unsatisfactory work product, unacceptable work proposals, sarcastic e-mail shirking responsibility to prepare project plans, and storage of non-work-related software on her workplace computer. *See* Retaliation Mot. at 7–10. During these events, Garner failed to dispute the accuracy of these complaints by accusing Motorola of gender bias or retaliation. Instead, Garner challenged authority by questioning why she even had to come in to work at 7:45 a.m.

and by blaming her performance problems on workplace factors such as computer resources. The e-mail correspondence between the parties, coupled with the affidavits, shows that there was a serious performance problem at work and that Garner openly admitted to it, but blamed her poor performance on workplace factors which did not seem to interfere with anyone else's ability to work productively at Motorola. These problems were not linked, at the time, to any gender discrimination. Furthermore, they appear to represent a continuation of the decline of Garner's workplace performance, which had begun well before she engaged in the protected activity.

An employer is not and should not be required to "back off" from its pursuit of performance-related concerns merely because an employee has brought charges of discrimination under Title VII. *See Mesnick,* 950 F.2d at 828 ("Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint."); *Jackson v. St. Joseph State Hosp.,* 840 F.2d 1387, 1391 (8th Cir.1988) (retaliation protection "does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct. . . .").

Nor may an employee disrupt workplace relations as a form of protected "opposition" of the alleged discrimination and then try to capitalize on the deserved discipline that the employer consequentially imposes. *See Nelson v. Pima Community College,* 83 F.3d 1075, 1080 (9th Cir.1996) (employee "refused to perform her duties in accord with her instructions, did things she was prohibited from doing. . . ."); *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756, 763–64 (9th Cir.1996) (an employee's opposition activity must be reasonable in view of the employer's interest in maintaining a harmonious and efficient

operation); *Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986) (low productivity, angry correspondence, and conflict with coworkers were legitimate nondiscriminatory reasons to dismiss); *Hochstadt v. Worcester Found. for Experimental Biology,* 545 F.2d 222, 230–33 (1st Cir.1976) (disruptive interference and disloyalty not protected).

To show retaliation in this context, Garner would have to present evidence that Motorola either unjustifiably increased its preexisting and long-standing negative evaluations of her performance, or failed to recognize her sudden workplace improvement, in an attempt intentionally to retaliate against her after the September 1995 Commission complaint. Because Garner has shown no such evidence, and even admits to her continued workplace deficiencies, no reasonable jury could find that Garner's work performance improved after September 11, 1995 such that Motorola might be found to have continued to discipline Garner for the purpose of retaliation. Ample evidence exists in the record showing that Garner agrees with her continuing poor performance evaluations after September 1995, and she blamed her performance on factors such as poor working conditions. Her best response to Motorola's legitimate reasons for dismissal is the bare assertion that all of the performance complaints were pretext to Motorola's retaliatory conduct. She has not produced any evidence, however, other than her own inconsistent assertions to that effect, nor does she deny that she was actually performing unsatisfactorily.

Absent a causal link between protected activity and negative action, a retaliation claim may not proceed. *See Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264–65 (9th Cir.1997). Garner has failed to sustain her burden of rebutting adequately Motorola's showing of legitimate, nondiscriminatory reasons for its adverse employment action, including the eventual dismissal of Garner after her problems

culminated in the discovery of non-work-related software on her computer.

## V. CONCLUSION

For the foregoing reasons, this Court on January 28, 2000, DENIED Motorola's Motion for Summary Judgment on Plaintiff's Pay–Related Claims [Docket No. 66] and GRANTED Motorola's Motion for Summary Judgment on Plaintiff's Retaliation Claim [Docket No. 62].